```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 19, 2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ALBERT D. NASSAR,

                            Plaintiff,              14-cv-8177 (KBF)

            -v-                            OPINION & ORDER

ERNEST MADERA, LINCOLN NATIONAL LIFE
INSURANCE COMPANY, and THE
MANUFACTURES LIFE INSURANCE COMPANY
OF NORTH AMERICA
now known as THE JOHN HANCOCK LIFE
INSURANCE COMPANY

                            Defendants.
------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

       Plaintiff brings this action against individual defendant Ernest Madera[1] and insurance companies John Hancock Life Insurance Company ("John Hancock") and Lincoln National Life Insurance Company ("Lincoln") (collectively, "the insurer defendants"). While the majority of plaintiff's Amended Complaint discusses the actions of Madera and other individuals who alleged induced him into obtaining financially unsound life insurance policies, his only claim against the insurer defendants is that they issued him policies that he did not qualify for in violation of their regulations.

---

[1] Plaintiff had also asserted claims against other individuals—Larry Schweiger, Joel Miller, and Donald J. Tradeu—but had failed to timely serve them. As a result, the Hon. Thomas P. Griesa, to whom this case was originally assigned, dismissed the claims against these defendants without prejudice for failure to prosecute. (ECF No. 29.)

Before the Court are motions for summary judgment by both insurance companies on the grounds of statute of limitations, failure to state a claim, and failure to raise a triable issue. Plaintiff's claims are frivolous in the extreme. For the reasons stated below, defendants' motions are GRANTED.

I.   BACKGROUND

   A.   Factual History[2]

In the late 1990s and early 2000s, plaintiff Albert Nassar owned a drug wholesale business. (Lincoln's Local R. 56.1 Stmt. of Undisputed Facts ("Lincoln 56.1") ¶ 13; John Hancock Local R. 56.1 Stmt. of Undisputed Facts ("JH 56.1") ¶ 19, 21.) Upon plaintiff's request, his personal friend Ernest Madera—who plaintiff understood was an independent broker for insurance companies—and other individuals ("Agents") who worked with Madera began assisting plaintiff with

---

[2]   The following facts are undisputed unless otherwise specified. The Court refers to only those facts that are relevant for resolution of this motion.
   The Court notes that in opposing summary judgment, plaintiff makes a number of statements in response to defendants' Statements of Undisputed Fact that are simply conclusory denials. For example, he states that "Mr. Nassar disputes or has no knowledge as to whether the underwriting process used in issuing the Manulife Policy to Mr. Nassar followed the correct Manulife's underwriting procedures." (Pl.'s JH 56.1 Counterstatement ¶ 36.) These statements are not supported by any record evidence and do not properly raise triable issues. Local Rule 56.1 requires that "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." In many instances, plaintiff has not met that requirement. Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (holding that speculation and conclusory denials cannot raise a triable issue). Moreover, several of plaintiff's statements are self-contradictory or contradict the pleadings. (Compare Pl.'s JH 56.1 Counterstatement ¶ 25 with id. ¶ 27; compare id. ¶ 48 with Am. Compl. ¶ 21.)
   Plaintiff has thus failed to specifically controvert many statements of undisputed fact asserted by defendants and has thus failed to carry his burden as to those facts. McKenna v. Wright, 386 F.3d 432, 435 (2d Cir. 2004) ("[T]he party opposing the motion [for summary judgment] cannot rely on allegations in the complaint, but must counter the movant's affidavits with specific facts showing the existence of genuine issues warranting trial.") In any event, the Court has independently reviewed the record and has determined the facts which are uncontroverted or are not in genuine dispute. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003); Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001).

obtaining life insurance policies that would bring him, inter alia, investment income and tax benefits. (Am. Compl. ¶¶ 27-28.) Plaintiff alleges that the Agents and Madera advised him that purchasing a variable life insurance policy would result in tax deductions and was a good investment. (Am. Compl. ¶¶ 27-35.) On their advice, plaintiff applied for the two life insurance policies that are the subject of this litigation. (Am. Compl. ¶¶ 33, 54.) Plaintiff applied for both insurance policies himself and knew the face amounts of insurance coverage he was applying for. (Decl. of David L. Moses ("Moses Decl."), ECF No. 64, Ex. A, ("Pl.'s Dep. Tr.") at 169.)

    1.  Application for the Manulife Policy

On December 23, 1999, plaintiff submitted an application to the Manufacturers Life Insurance Company of America ("Manulife") for a Venture VUL life insurance policy in the face amount of $6,597,892. (JH 56.1 ¶ 29.)[3] Maulife merged with defendant John Hancock in 2004. (JH 56.1 ¶ 14, n. 2.)

In his application, plaintiff disclosed that he had a personal net worth of $3.5 million, total assets of $5 million, and gross annual earned income of $3 million. He also submitted individual tax returns that reflected an adjusted gross income of

---

[3]  The application was signed by plaintiff and plaintiff alleges he is the de facto owner of the policy. (Am. Compl. ¶ 21.) The resulting policy was apparently formally owned by a number of trusts. The application listed First Union Bank, Trustee for the Benistar Trust, as the owner of the Manulife Policy. On March 28, 2000, plaintiff executed a trust certification confirming that the policy would be owned by Daniel E. Carpenter, trustee of the Benistart 419 Advantage Trust. On July 29, 2004, Carpenter assigned the policy to Wayne H. Bussey, trustee of the Grist Mill Trust. (JH 56.1 ¶ 46-50.)

$3.3 million in 2000 and $4.6 million in 1999.[4]  (JH 56.1 ¶ 30; Pl.'s Counterstatement of Undisputed Facts, ECF No. 78, ("Pl.'s JH 56.1 Counterstatement") ¶ 30.)  Along with the application, plaintiff also executed a Disclaimer and Hold Harmless Agreement on February 22, 2000.  (JH 56.1 ¶ 34; Pl.'s JH 56.1 Counterstatement ¶ 34; Decl. of Neil Merkl ("Merkl Decl."), Ex. 5, ECF No. 71-6.)

Although plaintiff alleges that John Hancock's policy requires that an applicant for insurance must have an income of at least $100,000 and a net worth of $1 million, (Am. Compl. ¶ 99), there was no such policy at John Hancock.[5]  (JH 56.1 ¶ 36; Decl. of Cassandra Pengelley ("Pengelley Decl.") ¶ 14.)  The underwriting procedures for the Manulife policy allowed the insurer to assess the risk of the applicant based on the application submitted, set a rate, and decide whether to issue an insurance contract.  (JH 56.1 ¶ 37; Pengelly Decl. ¶¶ 9-11.)  Manulife issued a variable rate life insurance policy to plaintiff for $6,597,892 on March 28, 2000.  (JH 56.1 ¶ 28.)

   2. Application for the Lincoln Policy

In December 2001, two years after he applied for the Manulife policy, plaintiff applied for another life insurance policy, this time from Lincoln, with a

---

[4] Plaintiff believed that these financial disclosures may have understated how much money he had in 1999-2000.  (JH 56.1 ¶ 30; Pl.'s JH 56.1 Counterstatement ¶ 30.)

[5] There is also no record evidence suggesting that Lincoln had such a policy.

death benefit of $50 million.  (Lincoln 56.1 ¶¶ 1, 2.)[6]  Plaintiff asserts that he applied for the policy on the advice of Madera and the Agents, but also acknowledged that he believed the policy would provide security to his family.  (Am. Compl. ¶¶ 53-54; Lincoln 56.1 ¶ 3.)

In his application, plaintiff indicated that he intended to keep the $16 million of prior life insurance coverage in place.  (Lincoln 56.1 ¶¶ 5, 20.)  Along with his application, plaintiff provided Lincoln with his 1999 and 2000 tax returns, which, as discussed above, showed annual incomes of $4.6 and $3.3 million.  (Lincoln 56.1 ¶ 17.)  Plaintiff also stated in his application that he had a net worth of more than $16 million and that he expected his income in 2001 to be $4.5 million.  (Lincoln 56.1 ¶¶ 18, 19.)

Lincoln's 2001-2002 underwriting guidelines allowed for face values of up to 14 times annual income for family protection for someone plaintiff's age at the time of application.  (Lincoln 56.1 ¶ 22; Decl. of Jordan Carreira, ECF No. 64-12, ("Carreira Decl.") ¶¶ 7-9; Financial Guidelines, Moses Decl. Ex. F.)  It also allowed additional insurance limits to protect estate growth for retirement planning: specifically, the formula for estate growth is a 6% growth rate for the estate, carried over the lesser of 25 years or 3/4ths of the applicant's life expectancy, multiplied by a 55% assumed estate tax rate.  (Lincoln 56.1 ¶¶ 25, 26; Carreira Decl. ¶¶ 7-9; Lincoln Financial Group Financial Guidelines, ECF No. 64-15.)  On January 25,

---

[6]   In July 2001, plaintiff moved from Florida to New York.  (Lincoln 56.1 ¶ 37; Pl.'s Dep. Tr. (ECF No. 64-3), at 199, 209.)

2002, Lincoln accepted plaintiff's application and issued him a life insurance policy for $50 million. (Lincoln 56.1 ¶¶ 32, 33.)

### 3. Premium Payments

Under the terms of the Manulife policy, plaintiff was not required to make regular premium payments on a fixed schedule. So long as the amount paid covered the monthly deductions and the net cash surrender value of the policy is greater than zero, the policy would remain in force. (JH 56.1 ¶ 42.) Any premium payments are credited to the policy's value. (JH 56.1 ¶ 43.) Plaintiff's Manulife policy had a planned annual premium of $333,333 for the first three years. (Am Compl. ¶ 40; Pengelley Decl. Ex. 1, at JH0000072.) Plaintiff alleges that on Madera's advice, he paid premiums of $83,333 in 2000, 2001, and 2002. (Am. Compl. ¶ 42; JH 56.1 ¶¶ 55-56.)

In July 2003, plaintiff signed and submitted a request to Manulife to reduce the face amount of his policy from the original $6,597,897 to $1.75 million. (JH 56.1 ¶ 57; Pengelley Decl. Ex. 1, at JH00000083-87.) Plaintiff did so because he did not like the return and did not want to keep putting money into the policy. (JH 56.1 ¶ 58.)[7]

Plaintiff's Lincoln policy had annual premium payments of $875,000 for the first two years. (Am. Compl. ¶ 57; Lincoln 56.1 ¶ 39.) Plaintiff paid the first annual premium in 2002. He elected not to pay the annual premium in 2003 because he was allegedly dissatisfied with the performance of the investment. (Lincoln 56.1 ¶

---

[7] Plaintiff's allegation that he had no knowledge of this change and did not consent to it, (Am. Compl. ¶ 46), is directly contradicted by his own testimony, (Pl.'s Dep. Tr. at 102.)

40; Pl.'s Dep. Tr. 190-200.) He did not make any more premium payments after the initial premium payment in 2002. (Pl.'s Dep. Tr. 190.)

### 4. Status of Policies

John Hancock asserts that throughout the life of the Manulife policy, Manulife and its successor John Hancock regularly sent Annual Policy Statements to plaintiff. (JH 56.1 ¶ 60; Merkl Decl. Ex. 9.) Plaintiff acknowledges that he reviewed at least some of these statements in 2005. (JH 56.1 ¶ 61.)

On October 16, 2012, plaintiff took out a $160,000 loan from the Manulife policy. As of January 28, 2014, the loan balance was $168,296.50. (JH 56.1 ¶¶ 62-63.) The Manulife policy is still in force and would provide a gross death benefit of $1.75 million. (JH 56.1 ¶ 63.)

Plaintiff did not make any additional payments on the Lincoln policy, and the policy lapsed in 2012. (JH 56.1 ¶ 55.) It is not clear when Lincoln sent plaintiff statements related to his insurance policy. However, plaintiff acknowledges that he did not make the second annual premium payment on the Lincoln policy because of the performance in the first year. (Pl.'s Lincoln 56.1 Counterstatement ¶ 40.) In addition, in 2003, plaintiff learned through his divorce lawyer that Madera and the Agents had received large commissions in connection with the sale of the Lincoln policy. (JH 56.1 ¶ 38.)

Plaintiff alleges he began receiving past-due notices from both Lincoln and John Hancock in September 2012. (Am. Compl. ¶ 64.) In the Lincoln notice dated

August 30, 2012, plaintiff was encouraged to apply for reinstatement. (ECF No. 64-32.)

  B. Procedural History

Plaintiff originally filed his complaint in state court on August 22, 2014. Defendant John Hancock removed the action to federal court based on diversity jurisdiction. (ECF No. 1.) Plaintiff subsequently amended his complaint on December 15, 2014. (ECF No. 13.) On February 9, 2016, plaintiff informed the Court that defendant Madera had filed a petition for bankruptcy in the Southern District of Florida on December 10, 2015.[8] (ECF No. 59.) The Court subsequently stayed the action as to Madera. As to the other defendants, discovery was completed on March 31, 2016. The instant motions followed.

II. LEGAL STANDARDS

 "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23.

---

[8] This action was transferred to the undersigned on January 15, 2016.

8

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations omitted). In addition, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)

("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

III.   DISCUSSION

    A.   Choice of Law

Plaintiff was a resident of Florida in 1999, when he applied for the Manulife Policy. (Am. Compl. 29.) He moved to New York in 2001, when he applied for the Lincoln Policy. (Lincoln 56.1 ¶ 37; Pl.'s Dep. Tr. (ECF No. 64-3), at 199, 209.)

In determining which state's law applies to plaintiff's claims, we first look to the choice-of-law rules of New York, where this Court sits. See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012) ("A federal court sitting in diversity . . . must apply the choice of law rules of the forum state." (internal citation omitted)); Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 394 (2d Cir. 2001). Under New York law, courts first determine "whether there is an actual conflict between the laws of the jurisdictions involved." Licci, 672 F.3d at 157. "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." Id. On the issues relevant to this motion, the laws of New York and Florida are either not in conflict, or resolution of the motion does not turn on the choice of law.

B. <u>Legal Basis of Negligence Claim</u>

Only the Sixth Cause of Action in plaintiff's Amended Complaint is asserted against the insurer defendants. (Am. Compl. ¶¶ 97-101; Pl.'s JH 56.1 Counterstatement ¶ 66.) The Amended Complaint does not identify a legal claim for this cause of action. (<u>Id.</u>) However, plaintiff appears to characterize it as a negligence claim. (<u>See</u> Pl.'s Mem. in Opp. to Lincoln's Mot. for Summ. J. ("Pl.'s Lincoln Mem.") at 5, 9; Pl.'s Mem. in Opp. to JH's Mot. for Summ. J. ("Pl.'s JH Mem.") at 2-4.) Plaintiff's legal theory appears to be that the insurer defendants sold him "a false product," or "a product he did not intend to acquire," or that "the company misrepresented what it was selling to Nassar." (Pl.'s Lincoln Mem. at 5-6; Pl.'s JH Mem. at 2-3.)

As a threshold matter, there is neither any allegation in the Amended Complaint nor any record evidence that the insurance policies issued to plaintiff were "false products." Furthermore, there is also no allegation in the Amended Complaint nor any record evidence that the insurance companies made any misrepresentations to plaintiff as to the policies; indeed, the bulk of Plaintiff's Amended Complaint contains allegations that Madera and the Agents—not the insurer defendants—misrepresented the nature of the policies. (<u>See</u> Am. Compl. ¶¶ 31-63.) Plaintiff also acknowledges that he knew what he was applying for and the face value of the policies. (Pl.'s Dep. Tr. 169.) The only basis of liability that plaintiff asserted against the insurer defendants in the Amended Complaint is that

11

the defendant companies issued policies to plaintiff in violation of their own underwriting guidelines. (Am. Compl. 65-68; 97-101; Pl.'s Dep. Tr. 168.)

As discussed below, plaintiff's claim against the two insurers fail as a matter of law for several reasons.[9]

    1.    <u>No Duty to Plaintiff</u>

Plaintiff's theory of liability against the insurer defendants fails because plaintiff has not alleged that the insurer defendants had a duty of care to him in the form of following their internal underwriting guidelines. "The existence of a duty is thus a <u>sine qua non</u> of a negligence claim: In the absence of a duty, as a matter of law, no liability can ensue." <u>Alfaro v. Wal-Mart Stores, Inc.</u>, 210 F.3d 111, 114 (2d Cir. 2000) (internal quotation marks and citations omitted); <u>see also</u> <u>Hunnings v. Texaco, Inc.</u>, 29 F.3d 1480, 1485 (11th Cir. 1994). Plaintiff does not allege that the insurers owed a duty to him in the form of following their internal underwriting policies. Plaintiff also has not alleged that the insurers had some heightened fiduciary duty to him at the time they assessed his applications for life insurance.

Furthermore, plaintiff has not pointed to any legal support for the proposition that underwriting policies of insurers in and of themselves create legal duties to applicants. <u>See</u> <u>de Kwiatkowski v. Bear, Stearns & Co.</u>, 306 F.3d 1293, 1311 (2d Cir. 2002) ("[D]eviation from industry or internal standards for monitoring risk and suitability does not necessarily amount to the breach of a duty."). In fact,

---

[9] The Court notes that since defendants' arguments for dismissal on these bases do not depend on any factual determinations and could have been made in motions to dismiss. The Court analyzes these arguments on purely legal grounds. The Court also notes that plaintiff has failed to discuss these bases for dismissal and that defendants' applications to dismiss these claims on purely legal grounds are unopposed.

12

courts in New York and Florida have expressly disavowed a cause of action based on the negligent issuance of an insurance policy based on failure to follow internal guidelines. Katchalova v. Perchikov, 842 N.Y.S.2d 471, 473 (App. Div. 2007) ("New York does not presently recognize such a theory of recovery based on the negligent issuance of an insurance policy."); CBF Tr. v. Hymans, No. 96 CIV. 9557 (JFK), 1998 WL 91123, at *4 (S.D.N.Y. Mar. 2, 1998) (finding no duty owed to plaintiff, in claim against insurer for negligently issuing an auto insurance policy without inspection); Life Ins. Co. of Georgia v. Lopez, 443 So. 2d 947, 949 (Fla. 1983) ("Insurance companies cannot in the usual course of business dealings be held to be guarantors of their customers' good intentions.");[10] Zarrella v. Pac. Life Ins. Co., 809 F. Supp. 2d 1357, 1364-65 (S.D. Fla. 2011) (finding no duty of insurer to "structure and design a policy to conform to tax law or to inform and warn the insured of the tax risks posed by the policy").

2. No Cognizable Injury

To adequately plead a claim of negligence, a plaintiff must allege that he suffered injury as a result of a breach of duty. Alfaro, 210 F.3d at 114 ([A] plaintiff must establish . . . (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." (internal citations and quotation marks omitted)). Here, plaintiff's theory of damages appears to be entirely based on the fact that he paid premiums for the insurance

---

[10] Florida courts have found that insurers have a limited duty when they have actual notice of the beneficiary's murderous intent towards the insured, a scenario that is inapplicable here. See Lopez, 443 So. 3d at 948.

13

policies. However, he fails to show why these payments constitute injury or how any injury was caused by the insurance companies' decision to issue him a policy. In other words, even if plaintiff could establish that the insurer defendants breached some legal duty to him in issuing him these policies, he has not demonstrated how such a breach led to any cognizable damages.[11]

Furthermore, as to the Manulife policy, plaintiff paid premiums in amounts smaller than the planned premium he had applied for, and those premiums provide the basis for an active life insurance policy that protects him today. After a reduction of the face value of the policy in 2003, plaintiff's Manulife policy provides death benefit of $1.75 million.[12] In addition, plaintiff was able to take out a $160,000 loan from the policy in 2012. (JH 56.1 ¶¶ 62-63.)

        3.     <u>Manulife Release Clause</u>

Plaintiff's claim against Manulife is also barred by a contractual agreement signed in February 2000 whereby plaintiff agreed to limit Manulife / John Hancock's legal obligations to those arising out of the insurance contract. (JH 56.1 ¶ 34; Merkl Decl. Ex. 5.) Plaintiff does not dispute entering the agreement and the release clause, and does not oppose this basis for dismissal.

---

[11] Furthermore, plaintiff acknowledges that he decided to stop paying his premiums because he was dissatisfied with the performance of the investment in 2003. (JH 56.1 ¶ 58; Lincoln 56.1 ¶ 40.) It is therefore difficult to see how plaintiff could support a causal link between the insurer defendants' decision to issue him a policy and any losses stemming from his failure to pay the premiums.

[12] Plaintiff has never alleged that he applied for or was denied a reduction of the Lincoln policy.

14

C. <u>Statute of Limitations</u>

Plaintiff's claim against the insurer defendants is also time-barred.  Under New York law, a negligence claim has a three-year statute of limitations. N.Y.C.P.L.R. 214(4); <u>In re R.M. Kliment & Frances Halsband, Architects & McKinsey & Co.</u>, 821 N.E.2d 952, 954 (N.Y. 2004).  Under Florida law, a negligence claim has a four-year statute of limitations.  Fla. Stat. Ann. § 95.11(3)(a); <u>Lurry v. Transcor Am., LLC</u>, 140 F. App'x 79, 80 (11th Cir. 2005).

Plaintiff first filed this action on August 22, 2014.  Thus, any claim against the insurers must have accrued not later than August 22, 2011 under New York law and August 22, 2010 under Florida law.  Plaintiff's claim against the insurer defendants, however, accrued many years prior to that:  he applied for the policies in 1999 and 2001; the policies were approved and active as of 2000 and 2002; and he made active decisions related to coverage and premiums on the policies in 2003.[13] Therefore, the statute of limitations on his claim expired long before three years prior to his filing this action.

Plaintiff appears to argue that because other individuals—namely, individual defendant Madera and the Agents—made misrepresentations regarding the insurance policies, a six-year statute of limitations should apply and that the cause of action should accrue from the date he became aware of those individuals'

---

[13] The record evidence is uncontroverted in showing that plaintiff was aware of any "injury" by 2003, when he learned that Madera and the Agents had misrepresented the commissions they earned on the sale of the Lincoln policy, (Lincoln 56.1 ¶ 38), when he decided to stop paying premiums on the policies because of perceived poor performance, (JH 56.1 ¶ 56, Lincoln 56.1 ¶ 40), and when he reduced the face amount of the Manulife policy because he did not want to put more money into the policy, (JH 56.1 ¶ 57-58.)  Moreover, plaintiff acknowledges that he reviewed the Manulife policy annual statements in 2005.  (JH 56.1 ¶ 61.)

15

misrepresentations. See N.Y. C.P.L.R. 213(8). This is incorrect. The claim against the insurer defendants is not based on fraud or misrepresentation at all. Rather, the claim is based on the insurers' alleged negligence in issuing plaintiff an insurance policy in excess of the limits set by defendants' underwriting guidelines. Therefore, it cannot constitute an "action based upon fraud" and does not qualify for the six year statute of limitations. The cause of action also does not accrue from the date of discovery of another party's alleged fraud or misrepresentation—which is a separate cause of action with its own statute of limitations. Instead, it accrues from the date of injury stemming from this claim, which, as discussed above, occurred in the early 2000s. For these reasons, plaintiff's claim against the insurer defendants is untimely and must be dismissed.

      D.  <u>Adherence to Underwriting Policies</u>

Notwithstanding plaintiff's failures to plead a claim against either insurance defendant as a matter of law and the untimeliness of his claims, plaintiff also cannot survive summary judgment because he has failed to raise a triable issue. Although plaintiff's case against these defendants rests on the allegation that they issued him insurance policies in violation of their underwriting requirements, plaintiff has failed to adduce any evidence suggesting that actually occurred. On the contrary, insurer defendants have shown that they abided by their internal underwriting policies in issuing the respective policies to plaintiff.

Plaintiff's core assertion appears to be that the insurers violated a policy that applicants have a minimum income of $100,000 and a net worth of $1 million. (Am.

Compl. 99.) Not only is there no record evidence that the insurer defendants had such policies, but plaintiff would have also met those minimums when he applied for coverage because his annual income was over $3 million in the years prior to his application and he had a net worth of about $16 million. (Pl.'s JH 56.1 Counterstatement ¶ 30.)

As to the actual underwriting policies that defendants had in place at the time of plaintiff's application, plaintiff does not allege any specific violations. There is also no record evidence supporting any violation. For example, Lincoln has pointed to uncontroverted evidence of its underwriting guidelines in the 2001-2002 period, when plaintiff applied for his $50 million Lincoln policy. The Lincoln guidelines for an individual with plaintiff's characteristics was 14 times annual income; additional insurance could also be sold to an individual for estate planning purposes. (Lincoln 56.1 ¶¶ 22-26.) Plaintiff acknowledges that his annual income at the time was between $3.3 and $4.6 million, which would result in an initial guidelines limit of about $47 million and $63 million. For estate planning purposes, plaintiff's $16 million net worth would result in an additional guidelines limit of about $40 million in coverage. (Lincoln 56.1 ¶¶ 22-28.) Thus, Lincoln's underwriting policies would have limited plaintiff's policy face value to well over $80 million. Plaintiff's $50 million insurance policy—even if combined with his then-existing $16 million in prior coverage—would have been well within Lincoln's guidelines. Plaintiff fails to point to any record evidence to put any of these facts in dispute.

As to Manulife, plaintiff purchased a policy with a face value of $6,597,892.  (JH 56.1 ¶ 29.)  While the record evidence is not as specific as to the underwriting guidelines set forth by Manulife at the time of plaintiff's application, there is no basis for the suggestion that Manulife exceeded any underwriting guidelines in issuing the policy to plaintiff, whose annual income was at least half of the face value of the policy at the time he applied.

IV.  CONCLUSION

For the reasons stated above, John Hancock and Lincoln's motions for summary judgment are GRANTED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 61 & 67 and to terminate John Hancock and Lincoln as defendants.

The action remains STAYED as to defendant Madera.

SO ORDERED.

Dated:      New York, New York
            July 19, 2016

                                    _____
                                          KATHERINE B. FORREST
                                          United States District Judge


CC: Ernest Madera
1900 Ocean Walk Lane, 105
Lauderdale by the Sea, FL 33062